# EXHIBIT 1

Andrew T. Ryan, Esq. (SBN 227700)
George Moschopoulos (SBN 249905)
*Of Counsel*
Alisa McKissick (SBN 363719)
THE RYAN LAW GROUP
317 Rosecrans Ave.
Manhattan Beach, CA 90266
Tel: (310) 321-4800
Fax: (310) 496-1435
andrew.ryan@theryanlawgroup.com
george@theryanlawgroup.com
alisa@theryanlawgroup.com

Electronically FILED by Superior Court of California, County of Los Angeles 3/25/2026 2:38 PM David W. Slayton, Executive Officer/Clerk of Court, By S. Ruiz, Deputy Clerk

Attorneys for Plaintiff

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

JENNIFER SIMONETTI, an individual,

Plaintiff,

v.

ASTRAZENECA PHARMACEUTICALS LP, a Delaware limited partnership; MICHAEL STRATTON, an individual; and DOES 1–50, inclusive,

Defendants.

Case No. 26STCV09637

**COMPLAINT FOR DAMAGES**

1. **Sex/Gender Discrimination (FEHA, Gov. Code § 12940(a))**
2. **Hostile Work Environment Harassment (FEHA, Gov. Code § 12940(j))**
3. **Hostile Work Environment Harassment—Sexual Favoritism (FEHA, Gov. Code § 12940(j))**
4. **Retaliation (FEHA, Gov. Code § 12940(h))**
5. **Failure to Prevent Discrimination, Harassment, and Retaliation (FEHA, Gov. Code § 12940(k))**
6. **Whistleblower Retaliation (Lab. Code § 1102.5)**
7. **Wrongful Termination in Violation of Public Policy**
8. **Failure to Pay Wages Due at Discharge (Lab. Code §§ 201–203)**
9. **Negligent Hiring, Supervision, and Retention**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Plaintiff Jennifer Simonetti was a high-performing, award-winning oncology leader for AstraZeneca in California. After she reported compliance irregularities and objected to her California-based supervisor's sexualized, hostile work environment—rooted in his extramarital affair with a company colleague—her supervisor cut her out of opportunities, denied earned recognition, and terminated her on pretextual "compliance" grounds following a perfunctory and skewed investigation. Plaintiff sues to recover lost earnings and equity, statutory penalties, emotional-distress and punitive damages, injunctive and restitutionary relief, and attorneys' fees and costs.

## PARTIES

2. Plaintiff is, and at all relevant times was, domiciled in California. She worked for Defendants while residing in Los Angeles County and elsewhere in California, and she performed substantial work in California.

3. Defendant AstraZeneca Pharmaceuticals LP is a Delaware limited partnership that regularly conducts substantial and continuous business in California, maintains employees and operations throughout California, and employed Plaintiff in California.

4. Defendant Michael Stratton is served as Plaintiff's direct supervisor in California, including as Oncology Area Director Gyn/GU-West, with authority over Plaintiff's work, assignments, recognition, and continued employment.

5. Plaintiff is ignorant of the true names and capacities of DOES 1–50 and therefore sues such defendants by fictitious names. Plaintiff will amend to allege their true names and capacities when ascertained. At all relevant times, each defendant was the agent, employee, managing agent, representative, joint venturer, or alter ego of each other defendant and acted within the scope of such relationships, ratifying and benefiting from the acts alleged.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under Article VI, § 10 of the California Constitution and Government Code § 12965(c)(1) because Plaintiff asserts California statutory and

common-law claims and seeks relief within this Court's jurisdictional authority.

7. Venue is proper in this County under Code of Civil Procedure § 395(a) and Government Code § 12965(c)(1) because Defendants transact business in this County, a substantial portion of the conduct occurred here, and Plaintiff would have continued working here but for Defendants' unlawful actions.

## ADMINISTRATIVE EXHAUSTION

8. Plaintiff has complied with all conditions precedent to suit under the Fair Employment and Housing Act to the extent required. Plaintiff has filed a complaint with the California Civil Rights Department (CRD) and attaches the CRD Right-to-Sue Notice as Exhibit A. Plaintiff's Labor Code § 1102.5 claim requires no administrative exhaustion.

## FACTUAL ALLEGATIONS

### A. Plaintiff's California Employment and Consistent Excellence

9. Plaintiff commenced California-based employment with AstraZeneca on or about January 10, 2020 as District Sales Manager – Oncology, with base salary, incentive eligibility, and sign-on bonus as set out in her offer package. Throughout her tenure, she consistently earned strong reviews, awards, promotions, and bonuses, and she was entrusted with high-visibility leadership assignments. In May 2024, Plaintiff was promoted to Senior Executive Oncology Business Manager, reporting to Defendant Stratton. She continued to perform at a high level, serving in leadership-development and recognition roles within the organization.

10. At termination in May 2025, Plaintiff's compensation included a base annual salary of approximately $249,425.55, annual bonus potential exceeding $70,000, valuable benefits, and equity/stock compensation, including unvested equity that would have accrued with continued employment.

### B. Protected Whistleblowing on Compliance Irregularities

11. Shortly after assuming her new role in May 2024, Plaintiff observed that some of her colleagues were not following rules regarding meetings, drink tabs, and other provisions of the Sunshine Act.

12. On or about June 11, 2024, during a Microsoft Teams call with Senior Director Randy Mastrangelo, Plaintiff reported that one of his direct reports, Bradley Rzendzian, was falsifying documents relating to customer meetings and falsifying meeting notes at conferences. Plaintiff also reported this misconduct to Defendant Stratton.

13. No inquiries were made, and no investigation was commenced in response to Plaintiff's reports. Plaintiff was told nothing would be done about her complaints.

14. In late 2024, Plaintiff submitted additional written complaints that an Associate Director was submitting falsified information and reimbursement forms for events that never occurred—potential violations of the Physician Payments Sunshine Act and company policies. AstraZeneca took no meaningful action to address these concerns.

15. Plaintiff also refused to participate in conduct she reasonably believed unlawful, including mischaracterizing personal/romantic encounters as business meals and facilitating document falsification.

**C. Defendant Stratton's Affair and Creation of a Hostile Work Environment**

16. Shortly after assuming her new role, Plaintiff observed that Defendant Stratton had become disengaged from his duties and team activities. To maintain and support the performance of her team, Plaintiff assisted in many leadership and team-related initiatives.

17. On or about August 23, 2024, Plaintiff had an in-person meeting with Defendant Stratton. During this meeting, Stratton, who was married at the time, disclosed to Plaintiff that he was engaged in an extramarital romantic relationship with another AstraZeneca employee, Traci Mason ("Ms. Mason"), a national account director in oncology based in Georgia.

18. Defendant Stratton asked Plaintiff to help him with "damage control" so he could control the narrative regarding his affair with an AstraZeneca employee and let people know he planned to divorce his wife.

19. Though uncomfortable with this conversation, Plaintiff replied by telling Stratton that while she wanted him to be happy, she would prefer to "stay out of it." She then tried

to steer the conversation back to work.

**D. The Austin Event – October 2024**

20. In October 2024, Defendant Stratton organized a leadership meeting of his team in Austin, Texas. Six team members attended, including Cathy Chakos, Michelle Salazar, Lavonne Mazza, Jason Franzak, Tricia Ruales, and Plaintiff.

21. While this was an AstraZeneca-sponsored event specifically for the West Coast Leadership team, Defendant Stratton nevertheless invited Ms. Mason to attend. During this event, Stratton introduced Ms. Mason to the team members as his "girlfriend."

22. Defendant Stratton asked Plaintiff via text message if Ms. Mason could come to Austin. Put in an uncomfortable position by Stratton regarding his romantic affairs, Plaintiff reluctantly indicated her approval to appease her boss.

23. Ms. Mason asked Plaintiff if she could borrow a blouse for the concert. Put in the uncomfortable position of having to appease her boss's girlfriend, Plaintiff reluctantly agreed and lent a blouse to Ms. Mason.

24. Ms. Mason attended the team-building events, including the concert, during which she and Defendant Stratton engaged in physical displays of affection in front of the team members, including Plaintiff, by engaging in kissing, necking, and groping. The entire team was uncomfortable and appalled.

25. Defendant Stratton and Ms. Mason left the team at the concert to return to their hotel room early, leaving Plaintiff to "handle things."

26. During the Austin event, the team members went to the pool at their hotel. Defendant Stratton sat by the pool and engaged in more public displays of affection with Ms. Mason in front of the team members, including Plaintiff. These displays included stroking, fondling, holding hands, kissing, and leaving to go upstairs to their room instead of attending a meeting that Stratton had planned for his employees.

27. Several team members, including Lavonne Mazza, were visibly upset having to watch this behavior. One of the male employees joked with Plaintiff that she should go ask for the blouse she had lent Ms. Mason because Ms. Mason was "probably having

sex" in it with Stratton.

28. When Defendant Stratton later returned Plaintiff's blouse to her, he leaned in and with a creepy smile said to her, "Don't worry we didn't do anything too naughty while [Ms. Mason] was wearing it -- but why would you wear a shirt [while being naughty]?"

29. Defendant Stratton was late for meetings or left meetings early. He was distracted and leaving the room to talk with Ms. Mason constantly. Plaintiff had created the content for the Austin meeting and asked Stratton to review it, but he never provided any thoughts or guidance.

30. Plaintiff left the hotel visibly distraught and cried in the car ride to the airport.

**E. The Cardinal Conference – November 2024**

31. On or about November 15, 2024, Plaintiff assisted with an event in the Los Angeles area involving Cardinal Health. Ms. Mason, the manager of the Cardinal account at the time, also attended. Defendant Stratton arrived at the conference with Ms. Mason and confirmed to Plaintiff that he and Ms. Mason were staying together at the hotel.

32. The next day, Defendant Stratton asked to take Plaintiff to lunch but also invited Ms. Mason. This was another uncomfortable and harassing lunch for Plaintiff. Stratton and Ms. Mason were touching, rubbing each other's thighs, and talking about their personal plans.

33. Defendant Stratton never spoke about business during the lunch, which Plaintiff had hoped for given how disengaged Stratton had been.

34. Defendant Stratton asked Ms. Mason to go on a separate check, making it look like only he and Plaintiff had been to lunch for business (which was never discussed).

**F. Sexual Favoritism**

35. Defendant Stratton's indiscreet public affair and the access, attention, and perceived influence conferred on Ms. Mason at West Coast leadership events and Los Angeles engagements—combined with expectations that Plaintiff manage the optics and fallout—communicated that sexual relationships affected workplace opportunities.

36. This course of conduct manifested "sexual favoritism," as recognized under

California law, because Stratton, a supervisor with authority, conferred access, presence, attention, and perceived influence on Ms. Mason in settings designed for Stratton's California team, while relegating Plaintiff to facilitate, sanitize, and cover for the supervisor's sexual relationship. The indiscreet conduct, combined with expectations that Plaintiff manage reputational fallout, sent the message that sexual relationships with decisionmakers could affect workplace opportunities.

37. The sexual favoritism was severe and/or pervasive and created a hostile, intimidating, offensive, and abusive environment for Plaintiff and would reasonably be perceived as such by a woman in Plaintiff's position.

**G. Plaintiff's Complaints to AstraZeneca Management**

38. Plaintiff immediately raised concerns about Defendant Stratton's inappropriate behavior and other compliance violations with AstraZeneca executives, including Josh Chapman and Robin Burkhart.

39. As described above, Plaintiff also reported—on two separate occasions and in writing—that an Associate Director was submitting falsified information and reimbursement forms for events that never occurred.

40. AstraZeneca took no meaningful action to address these concerns.

**H. Plaintiff's Confrontation with Stratton and Subsequent Retaliation**

41. On or about March 19, 2025, Plaintiff had a conversation with Defendant Stratton. She was initially hesitant to do so, given her fear of his reaction. Plaintiff expressed to Stratton how uncomfortable she was with his involvement of her in his workplace affair and warned him "to be careful" with how he was handling things.

42. Plaintiff further complained that Stratton had been treating her differently since the affair started and that he had requested her help with the "optics" of the affair.

43. In the weeks that followed, Defendant Stratton cut off Plaintiff from calls, interrupted her when she was giving her opinion, and continually denied her opportunities to develop in other leadership positions.

44. Defendant Stratton denied Plaintiff an exceptional leadership award which he gave

to another employee, a male, who did not perform as well as she did.

45. Vernon Watt, Global Head of Commercial Learning, observed the way Defendant Stratton treated Plaintiff in meetings.

46. Josh Chapman, Global (Senior) Director - Leadership and Management Development - Oncology, confirmed that Stratton denied Plaintiff opportunities despite Chapman specifically asking for Plaintiff to be involved in specific opportunities.

47. When Plaintiff asked Defendant Stratton to support her in her application for the position of Director of Hematology, he declined. Instead, he put his support behind another candidate, a male, who was not his direct report. This is despite Plaintiff's stellar work performance.

48. In addition, Mr. Chapman and Ms. Nancy Ghattas had recommended Plaintiff take part in increased roles within the company suggested by Ms. Ghattas, but Defendant Stratton declined.

49. Ms. Ghattas was kind enough to set up time with Plaintiff to mentor her. Ms. Ghattas knew Stratton was disengaged and distracted by his affair with Ms. Mason.

50. During these mentoring meetings between Plaintiff and Ms. Ghattas, Plaintiff discussed Stratton's affair and how uncomfortable she felt about the situations he had put her in, and that Stratton had blocked Plaintiff from leadership development programs critical to her career growth.

**I. Plaintiff's Wrongful Termination**

51. On or about May 16, 2025, Plaintiff was terminated by Defendant Stratton based on purported "concerns" about an event in November 2024 and a purported compliance violation stemming from events in September 2024—despite clear evidence disproving any wrongdoing.

52. The termination letter stated that the alleged violations involved meals with HCP engagement on November 13, 2024, including a policy breach on roles interaction (presence of promotional and non-promotional roles at the same HCP dinner), and concerns related to alcohol purchases during a Speaker Program on September 11,

2024.

53. The investigation was rushed and slanted, omitting material exculpatory interviews. AstraZeneca knew of, but chose not to interview, an HCP from UCLA who was available and willing to confirm that no alcohol was consumed.

54. The male employee who actually submitted the questionable expenses and invited Plaintiff to an event—Bradley Rzendzian—was not immediately terminated as Plaintiff was. Rzendzian had personally reassured Plaintiff that "everything would be fine," that his boss Mr. Mastrangelo had "got in front of this," and that all that happened to him was that he lost his bonus but not his job.

55. This demonstrated a pattern of favoritism and discriminatory treatment by AstraZeneca, wherein female employees like Plaintiff were terminated for alleged violations while similarly situated male employees were not.

56. It was only after Plaintiff's counsel submitted a request for production of Plaintiff's employment file and payroll records that AstraZeneca later terminated Mr. Rzendzian in what appears to be a transparent, preemptive attempt to mitigate exposure.

57. At no point was Plaintiff subject to any form of progressive discipline prior to her termination. The decision to terminate was abrupt and without the benefit of any prior warnings, performance improvement plans, or corrective measures.

58. The decision to terminate Plaintiff was put in the hands of Defendant Stratton—the very person who had subjected Plaintiff to a hostile work environment and who had treated her adversely after she objected to his behavior.

**J. Defamatory Statements**

59. Defendants published false statements of purported "compliance" violations to third persons without a legitimate need to know and with malice, including assertions that Plaintiff breached standards, provided alcohol to HCPs, attended events without legitimate business reasons, and failed to object as a Compliance Ambassador.

60. Publication included dissemination within HR/Employee Relations and management beyond those necessary to investigate, as well as communications that

foreseeably compelled Plaintiff to self-publish the false rationale to prospective employers.

61. The statements are defamatory per se because they impute professional misconduct and lack of integrity in Plaintiff's occupation. Any qualified common-interest privilege was vitiated by malice, including knowledge of, or reckless disregard for, falsity, willful avoidance of exculpatory witnesses, and reliance on a conflicted supervisor-accuser.

**K. Failure to Pay Wages**

62. AstraZeneca has not paid Plaintiff her Q1 2025 Field Sales Incentive Plan (FSIP) payment, which she estimates would have been at least $18,500.

63. Upon her termination, Plaintiff had approximately $93,000 of unvested stock options that she can no longer exercise because of AstraZeneca's wrongful termination of her employment.

**L. Officer, Director, and Managing Agent; Corporate Ratification**

64. At all relevant times, Stratton exercised substantial independent authority and discretion over Plaintiff's work assignments, recognition, access to leadership-development platforms, and the termination decision. He was entrusted to set, implement, and enforce operating and compliance expectations for the California team and to decide, or materially influence, who would receive high-profile opportunities and awards.

65. Human Resources and Employee Relations personnel, including those who coordinated the Opportunity to Respond and the disciplinary process, had authority to ratify and did ratify the termination and related investigative omissions despite notice of Plaintiff's complaints, the obvious conflicts facing her supervisor-accuser, and readily available exculpatory witnesses.

66. Defendants' officers, directors, and/or managing agents authorized, ratified, and adopted the conduct and decisions at issue, warranting punitive damages.

67. After her May 2024 promotion, Plaintiff observed colleagues skirting compliance controls governing HCP meetings, tabs, and Sunshine Act-related obligations. On or

about June 11, 2024, during a Microsoft Teams call with Senior Director Randy Mastrangelo, Plaintiff reported that one of his direct reports, Bradley Rzendzian, falsified customer-meeting documentation and meeting notes. Plaintiff also reported the same misconduct to her supervisor, Defendant Stratton. AstraZeneca failed to initiate any meaningful investigation or corrective action. In late 2024, Plaintiff submitted additional written complaints that an Associate Director submitted falsified information and reimbursement forms for events that never occurred. Again, AstraZeneca took no meaningful action.

**FIRST CAUSE OF ACTION**

Sex/Gender Discrimination (FEHA, Gov. Code § 12940(a))

(Against All Defendants)

68. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

69. At all relevant times, Defendants were "employers" within the meaning of Government Code § 12926(d), and Plaintiff was an "employee" within the meaning of Government Code § 12926(c).

70. Plaintiff is a member of a protected class under FEHA by virtue of her sex/gender (female).

71. Throughout her employment with AstraZeneca, Plaintiff was qualified for and performing competently in her position.

72. Defendants discriminated against Plaintiff because of her sex/gender by, among other things:

a. Passing Plaintiff over for promotions, job openings, awards, and high-profile projects for which she was well-qualified, which were routinely given to less qualified male colleagues;

b. Directing and expecting Plaintiff to divert her professional efforts toward managing and protecting Defendant Stratton's reputation in connection with his extramarital affair, rather than allowing her to focus on her own professional advancement and

responsibilities;

c. Denying Plaintiff an exceptional leadership award which was given to a less qualified male employee;

d. Refusing to support Plaintiff's application for the Director of Hematology position while supporting a male candidate who was not his direct report;

e. Terminating Plaintiff while initially not terminating male employee Bradley Rzendzian for the same or greater alleged violations.

73. Defendants' proffered reasons for Plaintiff's termination were false and pretextual.

74. As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, anxiety, and other consequential damages.

75. Defendants' conduct was oppressive, fraudulent, and/or malicious, entitling Plaintiff to punitive damages pursuant to Civil Code § 3294.

## SECOND CAUSE OF ACTION

Hostile Work Environment Harassment

(FEHA, Gov. Code § 12940(j))

(Against All Defendants)

76. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

77. Defendant Stratton, acting as Plaintiff's supervisor and agent of AstraZeneca, subjected Plaintiff to pervasive harassment based on sex/gender.

78. The harassment included, but was not limited to:

a. Stratton's overt and repeated public displays of sexual affection with Ms. Mason during work events, including groping, kissing, fondling, necking, and stroking, which Plaintiff and other team members were forced to witness;

b. Compelling Plaintiff to facilitate and manage Stratton's inappropriate workplace affair, including assuming responsibilities aimed at "softening" or minimizing her

supervisor's sexual conduct;

c. Compelling Plaintiff to lend her personal clothing to Stratton's girlfriend during a work event;

d. Subjecting Plaintiff to sexually inappropriate comments, including Stratton's comment when returning her blouse: "Don't worry we didn't do anything too naughty while [Ms. Mason] was wearing it -- but why would you wear a shirt [while being naughty]?";

e. Teasing by a male coworker about how Stratton and Ms. Mason were "probably having sex" while Ms. Mason was wearing Plaintiff's blouse;

f. Forcing Plaintiff to attend a "business lunch" that was actually a pretense for Stratton and Ms. Mason to engage in intimate touching while Plaintiff was present.

79. The harassment was severe and/or pervasive, and created a hostile, intimidating, and offensive work environment that unreasonably interfered with Plaintiff's work performance.

80. As Stratton was Plaintiff's supervisor, AstraZeneca is strictly liable for his harassing conduct pursuant to Government Code § 12940(j)(1).

81. As a direct and proximate result of Defendants' harassment, Plaintiff has suffered and continues to suffer damages, including emotional distress, humiliation, anxiety, and other consequential damages.

82. Defendants' conduct was oppressive, fraudulent, and/or malicious, entitling Plaintiff to punitive damages pursuant to Civil Code § 3294.

## **THIRD CAUSE OF ACTION**

Hostile Work Environment Harassment—Sexual Favoritism

(FEHA, Gov. Code § 12940(j))

(Against All Defendants)

83. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

84. Defendant Stratton subjected Plaintiff to quid pro quo sexual harassment when he

expected her to tolerate and facilitate his sexual conduct in the workplace.

85. This placed Plaintiff in the untenable position of unwittingly participating in a sexual scheme that was both inappropriate and unprofessional, jeopardizing her own reputation and livelihood.

86. When Plaintiff clearly opposed Stratton's demands, she was effectively punished through the loss of favorable working conditions, including being passed over for promotions, awards, and other high-profile projects, and ultimately being terminated.

87. As a direct and proximate result of Defendants' quid pro quo sexual harassment, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and anxiety.

88. Defendants' conduct was oppressive, fraudulent, and/or malicious, entitling Plaintiff to punitive damages pursuant to Civil Code § 3294.

## **FOURTH CAUSE OF ACTION**

Retaliation

(FEHA, Gov. Code § 12940(h))

(Against All Defendants)

89. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

90. Plaintiff engaged in protected activity under FEHA by, among other things:

a. Objecting to and complaining about Defendant Stratton's harassment and the hostile work environment he created;

b. Expressing discomfort with being involved in Stratton's workplace affair;

c. Complaining to management, including Josh Chapman and Robin Burkhart, about Stratton's inappropriate conduct;

d. Confronting Stratton on March 19, 2025 about his different treatment of her since his affair began.

91. The moment Plaintiff expressed her disapproval regarding Stratton's

extramarital affair and inappropriate behavior at work events, and raised concerns about being treated differently, she was immediately subjected to adverse employment actions.

92. Plaintiff was systematically passed over for promotions, key assignments, and other opportunities for which she was qualified.

93. Shortly thereafter, Plaintiff was terminated under pretextual grounds based on a woefully inadequate investigation—an action clearly intended to punish her for her complaints and to mask the true discriminatory and retaliatory motives behind her dismissal.

94. There is a causal connection between Plaintiff's protected activity and the adverse employment actions taken against her, as demonstrated by, among other things, the close temporal proximity between her complaints and her termination.

95. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and anxiety.

96. Defendants' conduct was oppressive, fraudulent, and/or malicious, entitling Plaintiff to punitive damages pursuant to Civil Code § 3294.

**FIFTH CAUSE OF ACTION**

Failure to Prevent Discrimination, Harassment, and Retaliation

(FEHA, Gov. Code § 12940(k))

(Against AstraZeneca and Does 1-50)

97. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

98. Government Code § 12940(k) imposes upon employers an affirmative duty to take all reasonable steps to prevent discrimination, harassment, and retaliation from occurring in the workplace.

99. AstraZeneca failed to take reasonable steps to prevent the discrimination, harassment, and retaliation suffered by Plaintiff.

100. Despite Plaintiff's repeated complaints to management regarding

Defendant Stratton's conduct, AstraZeneca failed to take any meaningful action to address or prevent further unlawful conduct.

101. AstraZeneca further failed to conduct an adequate investigation into the allegations against Plaintiff, deliberately choosing not to interview witnesses who could have proven the falsity of the allegations used to justify her termination.

102. As a direct and proximate result of AstraZeneca's failure to prevent discrimination, harassment, and retaliation, Plaintiff has suffered and continues to suffer damages.

**SIXTH CAUSE OF ACTION**

Whistleblower Retaliation

(Lab. Code § 1102.5)

(Against AstraZeneca Does 1-50)

103. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

104. California Labor Code § 1102.5 prohibits employers from retaliating against employees who disclose information to supervisors or other employees who have authority to investigate or correct violations, where the employee has reasonable cause to believe the information discloses a violation of state or federal statute, regulation, or rule.

105. Plaintiff engaged in protected whistleblowing activity by:

a. Reporting on or about June 11, 2024, during a Teams call with Senior Director Randy Mastrangelo, that Bradley Rzendzian was falsifying documents relating to customer meetings and falsifying meeting notes at congresses;

b. Reporting the same falsification to Defendant Stratton;

c. Submitting complaints in late 2024 that an Associate Director was submitting falsified information and reimbursement forms for events that never occurred—potential violations of the Physician Payments Sunshine Act and company policies;

d. Refusing to participate in conduct she reasonably believed unlawful, including

mischaracterizing personal/romantic encounters as business meals.

106. Plaintiff had reasonable cause to believe that the conduct she reported constituted violations of state and federal law, including the Physician Payments Sunshine Act and related regulations.

107. Plaintiff's protected whistleblowing activity was a contributing factor in AstraZeneca's decision to terminate her employment.

108. AstraZeneca cannot prove by clear and convincing evidence that it would have taken the same actions absent Plaintiff's protected activity.

109. As a direct and proximate result of Defendant's whistleblower retaliation, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, and anxiety.

110. Plaintiff is entitled to a civil penalty of up to $10,000 pursuant to Labor Code § 1102.5(f), as well as attorneys' fees and costs pursuant to Labor Code § 1102.5(j).

## **SEVENTH CAUSE OF ACTION**

Wrongful Termination in Violation of Public Policy

(Against All Defendants)

111. Plaintiff re-alleges and incorporates by reference each and every allegation as though fully set forth herein.

112. California recognizes a common law tort action for wrongful termination in violation of public policy, often referred to as a "Tameny claim" after *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167. This tort provides a remedy when an employer's discharge of an employee violates a fundamental public policy of the State of California.

113. California's fundamental public policies, as embodied in the Fair Employment and Housing Act (Government Code § 12900, et seq.) and Labor Code § 1102.5, include the following:

a. The prohibition against discrimination in employment based on sex/gender;
b. The prohibition against harassment in employment based on sex/gender;
c. The prohibition against retaliation for opposing or complaining about discrimination

or harassment;

d. The prohibition against retaliation for reporting suspected violations of law to supervisors or persons with authority to investigate or correct such violations;

e. The prohibition against retaliation for refusing to participate in activities that would violate state or federal law.

114. Defendants terminated Plaintiff's employment in violation of these fundamental public policies of the State of California by, among other things:

a. Terminating Plaintiff because of her sex/gender, in violation of the public policy embodied in Government Code § 12940(a);

b. Terminating Plaintiff in retaliation for her complaints about Defendant Stratton's harassment and the hostile work environment he created, in violation of the public policy embodied in Government Code § 12940(h);

c. Terminating Plaintiff in retaliation for her reports of compliance violations, including falsification of documents and reimbursement forms, in violation of the public policy embodied in Labor Code § 1102.5;

d. Terminating Plaintiff in retaliation for her refusal to participate in covering up Defendant Stratton's inappropriate workplace affair and to mischaracterize personal encounters as business meals, in violation of the public policy embodied in Labor Code § 1102.5.

115. Plaintiff's termination was the direct result of Defendants' animus toward her for engaging in protected activity. The close temporal proximity between Plaintiff's protected complaints and her termination, together with the pretextual nature of the stated reasons for termination and the disparate treatment of similarly situated male employees, demonstrates a causal connection between Plaintiff's protected activity and her termination.

116. The proffered reasons for Plaintiff's termination—purported "compliance" violations—were false and pretextual. AstraZeneca knew of, but deliberately chose not to interview, an HCP from UCLA who was available and willing to confirm that no alcohol

was consumed at the event in question. The male employee who actually submitted the questionable expenses, Bradley Rzendzian, was not immediately terminated as Plaintiff was, demonstrating that the stated reasons were not the true reasons for Plaintiff's termination.

117. As a direct and proximate result of Defendants' wrongful termination in violation of public policy, Plaintiff has suffered and continues to suffer damages, including but not limited to:

a. Lost past and future wages, salary, and earnings;

b. Lost past and future employee benefits, including health insurance, retirement contributions, and other benefits;

c. Lost equity compensation, including approximately $93,000 in unvested stock options;

d. Lost bonus and incentive compensation, including at least $18,500 in Q1 2025 FSIP payment;

e. Emotional distress, including depression, anxiety, humiliation, loss of self-esteem, and mental anguish;

f. Damage to her professional reputation and career trajectory;

g. Other consequential damages according to proof at trial.

118. Defendants' conduct was oppressive, fraudulent, and/or malicious, entitling Plaintiff to punitive damages pursuant to Civil Code § 3294. Defendants acted with the intent to injure Plaintiff, or with willful and conscious disregard of her rights, or engaged in despicable conduct carried on with a willful and conscious disregard of her rights and safety.

## EIGHTH CAUSE OF ACTION

Failure to Pay Wages Due Upon Termination (California Labor Code §§ 201-203)

(Against Defendant AstraZeneca and Does 1-50)

119. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

120. At all relevant times, AstraZeneca was an employer within the meaning of Labor Code § 200, and Plaintiff was an employee within the meaning of Labor Code § 200.

121. Under California Labor Code § 201, when an employer discharges an employee, all wages earned and unpaid at the time of discharge are due and payable immediately. "Wages" includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation. (Lab. Code § 200(a).)

122. Earned commissions, bonuses, and incentive compensation constitute "wages" under California law when the employee has satisfied all conditions precedent to earning such compensation, except those conditions that are within the employer's control or that the employer has prevented the employee from satisfying. (See Schachter v. Citigroup, Inc. (2009) 47 Cal.4th 610; *Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696.)

123. At the time of her discharge on or about May 16, 2025, Plaintiff had earned but not been paid the following wages:

a. Her Q1 2025 Field Sales Incentive Plan (FSIP) payment, which she estimates to be at least $18,500, based on her performance during the first quarter of 2025;

b. Any other accrued but unpaid wages, bonuses, commissions, or other compensation earned prior to her discharge.

124. AstraZeneca failed to pay Plaintiff all wages earned and unpaid at the time of her discharge, as required by Labor Code § 201.

125. Under California Labor Code § 203, if an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201 and 202, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced, but the wages shall not continue for more than 30 days.

126. A failure to pay wages is "willful" under Labor Code § 203 if the employer

intentionally fails to pay wages to an employee when those wages are due. (See 8 Cal. Code Regs. § 13520.) An employer acts willfully when it knows that wages are due and intentionally fails to pay them, regardless of any good faith dispute.

127. AstraZeneca's failure to pay Plaintiff all wages due upon termination was willful. AstraZeneca knew that Plaintiff had earned her Q1 2025 FSIP payment based on her performance during the first quarter of 2025, yet intentionally failed to pay this amount upon her discharge. AstraZeneca had no good faith belief that this compensation was not owed to Plaintiff.

128. As a direct and proximate result of AstraZeneca's failure to pay all wages due upon termination, Plaintiff is entitled to recover:

a. All unpaid wages, including her Q1 2025 FSIP payment of at least $18,500;

b. Waiting time penalties under Labor Code § 203, calculated at Plaintiff's daily rate of pay for each day wages remained unpaid, up to a maximum of 30 days. Based on Plaintiff's annual base salary of approximately $249,425.55, her daily rate of pay was approximately $683.36, resulting in maximum waiting time penalties of approximately $20,500.80;

c. Interest on all unpaid wages at the legal rate from the date they were due;

d. Reasonable attorneys' fees and costs to the extent authorized by statute.

## **NINTH CAUSE OF ACTION**

Negligent Hiring, Supervision, and Retention

(Against Defendant AstraZeneca)

129. Plaintiff re-alleges and incorporates by reference each and every allegation contained herein.

130. California recognizes a cause of action for negligent hiring, supervision, and retention of an employee. An employer may be liable for negligent hiring, supervision, or retention of an employee if the employer knew or should have known that the employee was unfit or incompetent, and that this unfitness or incompetence created a particular risk to others, and this risk resulted in harm to the plaintiff. (See *Doe v. Capital Cities* (1996)

50 Cal.App.4th 1038; *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133.)

131. AstraZeneca owed a duty to Plaintiff and its other employees to exercise reasonable care in hiring, supervising, and retaining its employees, including Defendant Stratton, to ensure that they would not engage in conduct harmful to other employees.

132. AstraZeneca knew or should have known that Defendant Stratton was unfit to serve as a supervisor and was likely to engage in conduct harmful to Plaintiff and other employees. Specifically, AstraZeneca knew or should have known that:

a. Stratton was engaged in a romantic relationship with another AstraZeneca employee, Ms. Mason, which created conflicts of interest and compromised his judgment as a supervisor;

b. Stratton was using company resources and work events to facilitate his personal relationship with Ms. Mason;

c. Stratton was engaging in overt public displays of sexual affection with Ms. Mason at company work events, in front of his subordinates;

d. Stratton was pressuring his subordinates, including Plaintiff, to facilitate and cover up his inappropriate workplace affair;

e. Stratton was treating Plaintiff differently and denying her opportunities after she expressed discomfort with his conduct;

f. Stratton had a conflict of interest and personal animus toward Plaintiff that made him unfit to make or influence decisions regarding her employment;

g. Plaintiff had complained about Stratton's conduct to AstraZeneca management, including Josh Chapman and Robin Burkhart.

133. Despite this knowledge, AstraZeneca failed to exercise reasonable care in supervising and retaining Stratton. AstraZeneca's negligence included:

a. Failing to investigate Plaintiff's complaints about Stratton's harassment and inappropriate conduct;

b. Failing to take corrective action in response to Plaintiff's complaints;

c. Failing to remove Stratton from his supervisory position over Plaintiff after learning

of the conflict and his inappropriate conduct;

d. Failing to separate Stratton from decisions regarding Plaintiff's discipline and termination, despite his obvious conflict of interest and personal animus;

e. Allowing Stratton to make or substantially influence the decision to terminate Plaintiff;

f. Failing to ensure that the investigation into the allegations against Plaintiff was fair, complete, and unbiased;

g. Failing to implement adequate policies and training to prevent supervisory harassment and retaliation.

134. AstraZeneca's negligent hiring, supervision, and retention of Stratton created a particular and foreseeable risk of harm to Plaintiff and other employees under Stratton's supervision. Specifically, it was foreseeable that:

a. Stratton would continue to engage in harassing conduct;

b. Stratton would retaliate against employees who complained about or refused to participate in his inappropriate conduct;

c. Stratton would abuse his supervisory authority to punish employees who did not support his personal agenda;

d. Stratton would use his position to terminate employees on pretextual grounds.

135. As a direct and proximate result of AstraZeneca's negligent hiring, supervision, and retention of Stratton, Plaintiff suffered the following harms:

a. Harassment and hostile work environment;

b. Denial of opportunities for advancement and recognition;

c. Wrongful termination on pretextual grounds;

d. Lost wages, benefits, and equity compensation;

e. Emotional distress, including depression, anxiety, humiliation, and mental anguish;

f. Damage to her professional reputation and career trajectory;

g. Other consequential damages according to proof at trial.

136. To the extent not barred by workers' compensation exclusivity, Plaintiff

seeks damages for AstraZeneca's negligent hiring, supervision, and retention. The workers' compensation exclusive remedy rule does not bar this claim because: (a) AstraZeneca had independent statutory duties under FEHA to prevent harassment and discrimination; (b) the conduct at issue was outside the normal risks of the employment relationship; and (c) the conduct was so outrageous and beyond the scope of the employment relationship that it falls within recognized exceptions to the exclusivity rule.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally where permitted by law, as follows:

1. For general and special damages, including back pay, front pay, lost benefits, lost bonus and incentive compensation, and the value of lost and/or wrongfully forfeited equity or stock compensation (including approximately $93,000 in unvested stock options), in amounts according to proof;

2. For non-economic damages for emotional distress, humiliation, anxiety, mental suffering, loss of enjoyment of life, inconvenience, grief, and harm to Plaintiff's career trajectory and professional reputation, according to proof;

3. For punitive and exemplary damages against AstraZeneca and Stratton, according to proof, based on malicious, oppressive, and/or fraudulent conduct and corporate ratification by officers, directors, and/or managing agents, pursuant to Civil Code § 3294. (See, e.g., *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211; *Passantino v. Johnson and Johnson Consumer Products, Inc.* (9th Cir. 2000) 212 F.3d 493, 515-516 [holding that intentional retaliation establishes the malice element necessary for an award of punitive damages]);

4. For statutory penalties and civil penalties, including:

   (1) Waiting time penalties under Labor Code § 203;

   (2) Civil penalty up to $10,000 pursuant to Labor Code § 1102.5(f);

5. For restitution and injunctive relief under the Unfair Competition Law (Business & Professions Code § 17200), including:

(1) Restitution of unpaid and/or wrongfully withheld compensation;

(2) Orders requiring compliance with California anti-discrimination, anti-retaliation, and wage-payment laws;

(3) Record corrections;

(4) Neutral reference;

(5) Appropriate training, policies, and monitoring;

6. For prejudgment and postjudgment interest to the maximum extent permitted by law;

7. For reasonable attorneys' fees and costs where authorized, including under Government Code § 12965(c)(6), Labor Code § 1102.5(j), and any other applicable fee-shifting provision;

8. For costs of suit herein incurred; and

9. For such other and further relief as the Court may deem just and proper .

DATED: March 25, 2026

THE RYAN LAW GROUP

Andrew T. Ryan
Attorneys for Plaintiff

**JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues and claims so triable.

DATED: March 25, 2026

THE RYAN LAW GROUP

Andrew T. Ryan
Attorneys for Plaintiff